Hear ye, hear ye, hear ye. United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good afternoon. This is Judge Wilson in Tampa, Judge Martin is in Atlanta, and Judge Joe Pryor is in Atlanta, and we're here for an oral argument in Willie James Pye versus the Georgia Warden. Susan Jill Benton is here for the appellate Pye, and Sabrina Graham is here for the appellate, the Georgia Warden. Counsel, I would advise you that we've read the briefs and we have examined the relevant parts of the record, if that will assist you in confining your arguments to the issues that are presented on this appeal. Mr. Thomas is the courtroom deputy, and he will serve as your timekeeper, and he will give you a two-minute warning when your time is about to expire, and of course he will advise you when your time to argue has expired. So it looks like we're all ready to proceed with our arguments, and Ms. Benton, are you ready to proceed? Yes, your honor. Thank you. May it please the court, Jill Benton for the appellant, Willie Pye. During Willie Pye's childhood, this same social worker visited his home countless times each year, as often as provided the habeas court with graphic descriptions of Mr. Pye's childhood, including that Mr. Pye's father, quote, beat the devil out of Pye and his nine siblings, that Mr. Pye's parents and older siblings consumed homemade whiskey daily and engaged in constant violence, what Mr. Lawson called raising sand. Sometimes Mr. Lawson wouldn't even get to the front door of the family home in broad daylight before a drunken brawl involving multiple family members would spill into the yard. He testified that the Pye family was desperately poor. He described in vivid terms the deplorable condition of their home, a tiny shack without heat or plumbing, crowded with filth and rotting food and unbathed children. This evidence from Mr. Lawson is uncontroverted, yet the jury never heard from this social worker, nor did the jury hear that Mr. Pye's father cruelly rejected him and singled him out for the harshest violence because of his intellectual disability and questions surrounding his paternity, nor did the jury hear from the sheriff's deputy who responded to the constant domestic violence calls at the Pye home and who was tasked with finding the smaller Pye children who had hidden in the surrounding woods when the fighting broke out. That testimony, too, uncontroverted. The jury did not know that Mr. Pye's school records show that he missed school because there were not enough shoes to go around. The jury did not hear that as a newborn, Mr. Pye was inadequately nourished and left alone for 10 to 12 hours each day with his 10-year-old sibling. That evidence, too, in the record, completely uncontroverted. And the jury did not know that a cadre of experts, including the government's own expert, agreed that Mr. Pye's IQ is 68. As this court has held repeatedly in cases like Brownlee and Daniel, echoing the holdings of the U.S. Supreme Court going all the way back to Williams v. Taylor, quote, borderline intellectual disability that does not rise to the level of intellectual disability under Atkins is still itself powerful mitigation. In other words, testimony like that given by the warden's own expert in this case, Dr. King, would have itself offered, quote, powerful mitigation. And yet the jury never heard it. Well, you've got two claims that you developed most of your attention to in your 245-page brief. The intellectual disability claim, how do you get around the state's procedural default? I wonder if you can just provide us, what was the cause for failing to raise the Atkins v. Virginia claim in the state court, either in trial court or on direct appeal? What was the cause for that? The cause would be trial counsel's ineffectiveness and failing to compile the evidence. So we're, again, kind of traveling under an ineffectiveness framework. That was the cause. And the state habeas court actually went to the merits of the Atkins v. Virginia claim in order to conclude that he was unable to establish prejudice to excuse the procedural default. Why don't you tell us why we should not rely upon the state habeas courts to determine, why we should not give the state's determination the deference that it is entitled to under AEDPA? Of course. So the short answer, the 30,000-feet answer to that question is because the state habeas court made multiple unreasonable determinations of fact in assessing the Atkins evidence. And I will, I'm happy to address the court's question in that regard and talk about what the unreasonable determinations of facts were that led the habeas court to, on the one hand, reject testimony like that from Dr. Swanson, and on the other hand, embrace testimony that Dr. King gave. But before I answer that question, I think I want to say something about our brief and the disability evidence here. You know, the burden of proof in Georgia, that beyond a reasonable doubt legal standard, when that legal standard intersects with 2254D, especially 2254D2 in a case where you have competing testimonies from two experts about one prong of the intellectual disability diagnostic criteria, right, those two legal standards together put a pretty substantial obstacle in between an intellectually disabled federal habeas partitioner and relief. And so we acknowledge that. But those obstacles don't attend when you look at the penalty phase prejudice from trial counsel's failure to obtain a mental health evaluation and trial counsel's failure to put this intellectual disability in front of the jury to be weighed in the penalty phase. Yes, of course 2254D still applies, but the equation is a completely different equation. And so, you know, the intellectual disability evidence is relevant because Mr. Pye is in fact the entirety of the ineffective assistance claim with respect to trial counsel's deficiency here. You cannot evaluate how reasonable or unreasonable it was to fail to have this man evaluated unless you understand how disabled he is. And you cannot, you cannot evaluate the prejudice that flowed to that in the penalty phase without understanding the vastness of that intellectual disability evidence. Well, every expert in this case says his IQ is 60. The state makes the argument in its brief that the state trial court relied on Mr. Yarborough's testimony at the evidentiary hearing that Mr. Mosteller made strategic choices based on the information provided that there were witnesses who were reluctant and uncooperative that he spent 211 hours as reflected on his expense voucher. He just didn't bill for everything he did. I mean, why should we reject that? Aren't we required to give deference to those determinations on the part of the state habeas court? Well, you're only required to give deference to the evidence. The state habeas court made the findings you just referred to judge Wilson on the basis of Mr. Yarborough's testimony alone. And that testimony is, I don't remember much, you know, and there's this vast body of evidence. We have trial counsel's entire file. We have the state habeas court record. It relies upon Mr. Yarborough's speculation in some regard and to the exclusion of all this other evidence, you know, to the state habeas court gets where it does by imagining that some phantom investigation occurred that somehow was never captured in the file. This was his investigator that he relied upon, right? And representing Mr. during the course of the trial. Why can't the state credit Mr. Yarborough's testimony as to the work that was done by Mr. Mostiller and the strategic choices that he made during the course of representing Mr. Fine? Well, I think, first of all, it's worth parsing which strategic choices, you know, there is the sort of glaring overarching choice. I don't even know that it's an omission that I was referencing earlier. And that's the failure to get a mental health evaluation. And I want to set that aside because I do want to turn back to that because the state habeas court does not address that. And Mr. Yarborough is in fact surprised during his deposition to learn that a mental health evaluation wasn't done. So I don't want to get too far from that piece of Mr. Mosler's deficiency. But Mr. Yarborough says things like they interviewed everyone on the state's witness list. That's 60 witnesses. There's no evidence of that that he would the state habeas court, you know, respondent writes that those 60 witnesses on this on the state's witnesses were interviewed by Mr. Moss by Mr. Yarborough, yet he did not memorialize a single one in a memo that not one of those witnesses volunteered a fact that was useful in cross examination during the trial. Didn't the state have an open file policy? Yes, there is testimony that that if they made arrangements, Mr. Master and Mr. Yarborough could to the district attorney's office and look at what they have testified during the evidentiary hearing that Mr. Mosler had utilized the state's open file policy. Yes. I mean, that doesn't speak to the reasonableness of what the state court finds with respect to the investigation. Miss Benton, I think you have a tough road to hoe in establishing for the ineffective assistance claim that the findings of fact were unreasonable. But I think it's possible that trial counsel was deficient, even under the facts as found by the state habeas court, that that was unreasonable under Strickland and Williams and Wiggins. So, but it seems to me that you're not really a but it seems to me that your claim has really two aspects. One is a failure to investigate. And then the second part is a failure to present the mitigating evidence that they may have found. So how do we evaluate those two aspects of the claim when they're failures in both respects under the case law? Are you speaking with respect again to which piece of the mitigation evidence? Because we've got sort of several tentacles, if you will, to the mitigation case, there's the mental health piece, there's the poverty piece, which trial counsel was on notice of certainly knew something about. There's the physical abuse piece. There's the very early, you know, childhood neglect, the abject neglect piece. And what trial counsel did with respect to each of those pieces is slightly different. And I think the response to your question differs depending on which aspects we're talking about. So as I look at the record, it seems like the state habeas court really only addressed the presentation of some evidence of poverty. Is that right? So with respect to everything else, it would be a failure to investigate claim. Is that right? Is that your position? Right. Well, the state habeas court says, you know, they did present a little bit of it, but they were focused on residual doubt. They were focused on mercy and that he had good character and that he had a good relationship with the victim. So how does that how did those claim? So are we again, again, I guess I want to kind of parse out the different pieces. One, I think the easiest and clearest, you know, the plainest instance of an absolutely unreasonable application of the law and unreasonable determination of fact is with respect to the failure to get a mental health evaluation. If you look at prejudice on that front, the state habeas court writes that, well, you know, if you see above, I've made all of these, you know, I've written all these findings with respect to Dr. King's testimony and Dr. Swanson's testimony as it pertains to the Atkins claim. And so the intellectual disability evidence, the IQ of 68, the deficits that he has, they fail to support a penalty phase prejudice finding for exactly the same reasons that they failed to support an Atkins claim. And that reasoning has been rejected by the Supreme Court. It's been rejected by this court in cases like Daniel, if you look at Daniel v. Commissioner, it says, you know, just because evidence fails to meet the legal standard for meeting an Atkins claim, that doesn't mean that one juror isn't going to weigh the fact that this one juror isn't convinced by clear and convincing evidence that he's intellectually disabled. It doesn't mean that all of this Atkins evidence suddenly evaporates. So that piece alone of the state habeas court's finding with respect to prejudice, it gets us to relief on just the court just sort of casting aside the evidence of poverty, drunkenness, violence, neglect. The court does things that are also problematic and are also an unreasonable determination of fact. And I can speak to those. Yes, please. So the court identifies specific problems with the affidavit evidence that it says would have made the jury disregard the entirety of it or the court uses disregard the entirety of it. The first is it says that some affidavits were later corrected. That's not correct. That's not what the record shows. The record shows that there's only one mitigation affiant, Mr. Lawson, who provides a second affidavit. That second affidavit was prepared by respondents counsel. And it says only I had no direct knowledge of Mrs. Pye, Mr. Pye's mother drinking while she was pregnant. You know, one of the things he testifies to in his several pages of affidavit testimony about this family is that he he observed Mrs. Pye drunk while she was pregnant, even though her drinking continued even during this. But you can do a fact that's not even in dispute. While we're on the topic of the affidavits, I just wanted to get you to check my understanding about this. So I listed 32 affidavits that were submitted on behalf of Mr. Pye. And by my count, the the state habeas court only really even mentioned six of them. Is that does that sound about right? Yeah, I think two of those six are not to mitigation. I would have to look. I don't know what your six list is. But some of those are guilt based affiants who also, you know, have penalty based prejudice implications. And in any event, I don't it seemed like to me, the judge was mistaken on on what federal law requires what Supreme Court law requires. I mean, he said, you know, affidavits are not usually significant in this setting. And, you know, that's just flat out in kind, contrary to Wiggins and Porter, and all those cases that say, you know, there ought to be a thorough evaluation of all types of the mitigation evidence. It so I don't know if I'm going off on the wrong track. You are not Judge Martin, I do think that there are criticisms of where I was headed, there are criticisms of only a small percentage of all the affidavits. Those criticisms are that themselves flimsy, and I can address each of those criticisms. But most of those criticisms attend to, you know, three family members, Curtis, Ricky, those are Mr. pies, younger brothers, and his mother, Lola May, those, those three family members, and then says, you know, family members are biased. Well, we could take from the prejudice equation, all of the family affidavits here. And what you would have left is the testimony of multiple teachers, including one teacher who did not testify by affidavit, but testified live in front of the habeas court, you would have the testimony of the sheriff's deputy who was responsible for responding to all of the domestic violence calls at the house during Mr. pies childhood, you would have the testimony of the woman who Donna pots who owned the store, the country store at the end of their little road, and who testified about what she saw and observed at the family and what a nuisance they were in the community, you would have the testimony of, again, Mr. Lawson, you would have the testimony of neighbors, Lester Henderson, all of these people testify, not only consistent with one another, but consistent with the contemporaneous records in the case, the defects records, the school records, you know, the idea that you could cast aside all of these non family member witnesses who have no possible motive or incentive to shade their testimony. And who, whose testimony is consistent with one another and consistent with the records, to set aside that and say that does not establish prejudice is is absolutely an unreasonable application of Strickland. Go ahead. Go ahead. I was going to say in order to accept your argument, though, we would have to we would have to reject the state habeas courts acceptance of Dewey Yarborough's testimony that the family members and others that he attempted to contact were uncooperative. And in fact, one family member informed Mr. Yarborough, that quote, I got himself into this, he can get himself out of it, close quote. So I mean, how do we how do we get around these determinations by the state habeas court that we're required to get that first? Well, you can get around them. That's not what the record reflects. But let's just take those at face value. Let's say his family was not cooperative. Again, why not tap all the other members of the community who know what's happening in this household? Why not stop at the little country store at the end of the pies road and ask those witnesses why not contact his teachers, this is a really small town in a small school district, a small school system. There is no Mr. Yarborough in his deposition cannot even think of another source of mitigation information besides family members. He's stumped. He just says, I don't know. You know, he says he tried to get family support. Second, it's not true that the family wasn't cooperative. There is a memo that says some brothers didn't return a phone call. But Mr. Price older sister Pam was in charge of recruiting the mitigation witnesses and sat for interviews with them. She and they say she'll make a good witness. Why not have a more fulsome interview with her? Why not ask her for the names? You know, why not when one family member says we grew up without heat and running water? Why not say tell me more about that? This is not an uncooperative family. You know, let me let me ask you, I want to ask you a question before your time runs out. The district court effectively skipped over deficient performance and went right to prejudice as the court is entitled to do. And found that the state habeas course prejudice determination was not unreasonable. If we were to conclude that that is wrong, in other words, that the determination of prejudice pierces and for ed pedifference, then would it be appropriate to remand to the district court to consider de novo, the deficient performance prong? Well, I think that you can and and have in other cases reached the deficient performance prong. I mean, it is a it's de novo review of the district court's order. So yeah, I think remand might be appropriate. But I also think it's equally appropriate to reach the deficiency. Thank you. And on the deficiency prong, I do want to circle back, there are, you know, three things that every reasonable counsel in this case should have observed and known points to the need for a mental health evaluation in this case, three things that make it so that no reasonable lawyer can go to trial without a mental evaluation. Those three things are the Department of Corrections records, the school records and trial counsel's own observations that Mr. Pike could not read or write very well. First, trial counsel did not get the Department of Corrections records. Those Department of Corrections records trial counsel knew knew he had to get him. He knew that this district attorney in every capital case in Spalding County in the 1990s, they tried all these capital cases against each other. They both knew ahead of time what the others closing arguments were going to be. They predicted them to the jury with absolute certainty, knew that Mr. Pies future dangerousness that his dangerousness with respect to killing a prison guard would be the district attorney's central argument for death. And yet he didn't get his Department of Corrections records. That's undisputed. The Department of Corrections records were not requested. They have multiple references. Those Department of Corrections records from the late 1980s have multiple. I see that my time is up. So I'm happy to either finish the point or you can finish your point. The Department of Corrections records, I counted six separate pages, reference a serious mental health symptom, inability to cope with reality, a flat affect, serious emotional withdrawal, reports hearing voices. The Department of Corrections records over and over again, note mental health symptomology. And at one point they even say further evaluation is needed both as to a potential learning disability and as to psychological symptoms. There could not have been a clear command that this man needs a mental health evaluation. And if you had paired those Department of Corrections records, which trial counsel did not get with the school records, which trial counsel gotten much too late. And with trial counsel's own understanding that his client struggled to read and write, no reasonable lawyer can fail to get the mental health evaluation in this case. And the state habeas court simply did not contend with that. Thank you, Miss Benton. I believe that you have preserved some time for rebuttal and we'll now hear from the state. Miss Graham, you may proceed. Judge Wilson, can I, I'm having a little bit of trouble with sound, so I'm going to get my earbuds. So I'm going to step away for just a second, right? I'll be right back. All right. Thank you. May it please the court. My name is Sabrina Graham. I am here on behalf of the warden asking this court to affirm the district court's denial of habeas relief. I apologize for the mess behind me. I could not get the virtual background to work. It kept cutting off half of my head. So sorry about that. Okay. So I would like to take the intellectual disability claim first as that was first in our brief and briefly talk about that. As Judge Wilson pointed out, the state habeas court clearly made a merits determination on the intellectual disability claim. And as this court has recently stated in Reeves, that's a factual determination. And if there's anything in the record to support that, then that decision stands under a DPA. See, I'm confused about that now because did the state habeas court actually address the merits of the intellectual disability claim or did it simply address it for the purpose of determining that I failed to establish cause and prejudice to excuse the procedural default? Yes. What I'm stating is under state law at that time and now where you have an intellectual disability claim that wasn't raised below and you bring it for the first time in state habeas, the Georgia Supreme Court has said it is procedurally defaulted, but you look at it cause prejudice and the miscarriage of justice standard. And at the beginning of the state habeas courts evaluation, it noted that. And then under that standard, it went to the merits of the particular issue. And at the end, it said, I find that you haven't shown prejudice to overcome the default of this claim. So you do have a merits analysis there, albeit under prejudice of justice. If we have a merits determination, can we apply to NOVA review of that merits determination? No, it would still fall under the AEDPA. And you would have to find, and as this court said in Reeves, that is a factual finding. And you have to find there was no support in the record for those factual findings. And even if you did apply to NOVA review, the factual findings still get deference even without the AEDPA. Ms. Graham, I think I agree with you with respect to the intellectual disability claim, because I find it hard to see how the state court's findings could be unreasonable, given that this was basically a battle of the experts. But what about Ms. Benton's point that the intellectual disability evidence should have been used as mitigation in the penalty phase? Sure. So I'll move on to the ineffective assistance claim. I think the easiest way to the district court's determination regarding deficiency, but I understand there's a lot of contradictory evidence there. And I think that's a lot of what this case comes down to. When you look at the full record, there's evidence on one side, evidence on the other side, and some of it goes together and some of it doesn't. Looking at the prejudice analysis, here you have the state habeas court. It has gone through all of the particular information. And I don't think that in the evidence, I don't think that the state habeas court completely discounted the affidavits. In fact, the court said, I can find this hard. Sorry. The court simply said accordingly after it went through the affidavit evidence, and it pointed out some problems with the affidavit evidence, which under also Georgia they're required to do. They're required to go through the affidavits and see if they are credible. The court says this court has reviewed petitioner's affidavit evidence with caution, including the affidavit evidence, alleging abuse and deprivation of petitioner where affidavit testimony is extensively relied upon. It just says it reviewed it with caution, which is appropriate. Ms. Graham, I want to just go on to the next sentence there. I mean, the court seemed to be a connection between the impoverished background and the reason for the crime, and that's not what mitigation evidence is. So that's a mistake, isn't it? I mean, that's contrary to Porter and those cases, isn't it? Oh, I'm sorry. I do not think that is contrary to any Supreme Court precedent. I do think that you can look at the causal link in between the mitigating evidence they are presenting and the crime, because that's what it's supposed to do. I'm not saying that you can't. I'm saying that that's not the only evaluation you give to those kinds of materials. Right. And it seemed to me that the court thought it did. I do not read it that way. I just see that that's one of the reasons why the court found that the affidavit evidence wasn't particularly mitigating. That's all. Was there any defense of remorse put up by Mr. Pye's counsel? No, there was not. Mr. Pye testified during the guilt phase that he did not commit the crime. OK. Thank you. His family did testify that he didn't fire the shots, but he participated in the kidnapping and the gang rape, right? Well, his testimony was actually that she was not kidnapped, that she came willingly, and he testified that she willingly offered sex for drugs. And he did not put it in terms of a gang rape. I would obviously put it in those terms. But from what I remembered, he stated that he had sex with her in exchange for drugs, and then he didn't know if the other two had sex with her as well. Right. Did Mr. Mostiller hire a mitigation expert? No, he did not, Judge Wilson. He just said Mr. Yarbrough, who had worked on him with several other death penalty cases. Dewey Yarbrough was just an investigator, right? Correct. Haven't we said before that in a capital case, it could be ineffective assistance not to retain a mitigation expert if there's going to be a penalty phase? I'm not aware of any Supreme Court precedent that requires a mitigation expert be hired. Also, I think it has to do with what's done in that community, and there isn't any testimony or evidence in this particular case showing that a mitigation expert was normally hired in Smalding County for these types of cases. But if we determine that there was, as a result of what we see at the evidentiary hearing on post-conviction relief, that there was an abundance of mitigating evidence that could have made a difference in the case, why can't we find prejudice under those circumstances? Sure. And again, there is mitigating evidence, but for almost every piece of the mitigating evidence here, you have aggravating evidence. For example, when you're talking about the fact that he says that he was abused by his father, all the affidavit evidence, you have Mr. Pye actually telling Dr. King he was not physically or sexually abused as a child, so you have contradictory evidence there. Regarding the low IQ, I agree that could be mitigating evidence, absolutely. But in this particular case, you have the evidence pointing to Petitioner as the leader of the crime, and you have him planning, and the evidence in support of the planning is overwhelming. You have the ski mask, you have them kicking in the door, you have them wiping down their fingerprints not only at the motel, but also in the car. And also, you have the jury listening to him testify during the guilt phase for a pretty lengthy amount of time. So, I understand that that's mitigating, and we're not arguing that evidence like that is not mitigating. We're just saying when you look at the totality of the circumstances here, that aggravating evidence outweighs the mitigating evidence. Going back to Judge Martin's question about the connection between the crime and the mitigating evidence of his childhood and background, it seems to me that could be an unreasonable finding by the State Habeas Court that the two weren't connected, because here you have mitigating evidence adduced in State Habeas about abuse that Mr. Pye suffered as a result of domestic violence, and there was a question of parentage, just like there was in this crime. So, how can you even say that they're unconnected? Well, at the time of the crime, Mr. Pye was 28 years old. Now, the evidence regarding his parentage that comes from the affidavits, there is no proof that Mr. Pye was not his father. Regarding the causal link there, I could understand if Mr. Pye had gotten angry. Assuming all the information affidavits were true about the parents not getting along and being abusive, I can understand if Mr. Pye had lashed out at them, but he didn't. He lashed out at his ex-girlfriend, and as this court has stated, for example, in the Gissendaner case, where she alleged that she was sexually abused and things of that nature, and the court said, but your crime was the murder of your husband. It wasn't, you know, you didn't go after anybody else. So, I think there it's not unreasonable to say that someone's 28 years old, years removed from their childhood, and they go and they kidnap their ex-girlfriend, and there were several reasons why they said they kidnapped her. One could have been because of the parentage of the child. The other one was because her boyfriend that she lived with had allegedly won the lottery or won a settlement, and they wanted the money, and there was evidence that they had thrown some of their belongings out, and he takes this lady, and he allows her to be gang raped, and then he puts her out on the dirt road, and he shoots her and leaves her to bleed to death. I'm not sure exactly what you're, why it's unreasonable to say that there isn't a real causal link between an impoverished childhood and this particular crime. Wasn't the point when we look at the Supreme Court cases that it's up to the jury to make these determinations, and that this evidence should have been put before the jury. In the Porter case from the Supreme Court, Mr. Porter was 54 years old, and yet the court said that there was mitigating evidence from his childhood that could have impacted the juror's evaluation of his culpability. I think that the point here, and the court, the point that the court makes in Strickland and in many other cases is that you have to weigh the evidence. You have to look at aggravating evidence and the mitigating evidence. You cannot just look at the mitigating evidence. You have to look at it all together, and under a DPA, you have to decide whether or not the state court's decision on that was unreasonable to weigh it out in the manner that it did, that no other reasonable jurist would have weighed it the way it did. And in this particular case, regarding that way, the state habeas court's decision is a summary denial on the cumulative effect of this evidence. So if there's anything in there that supports the state court determining that when you look at all the aggravating, you look at all the mitigating, you don't have a reasonable probability of a different outcome, then you have to affirm that decision. And again, I'll go back. I mean, there's more contradictory evidence. For example, if they put in the evidence that he had alleged organic brain disorder, or I'm sorry, organic brain damage and a frontal lobe, then you have Dr. King's testimony rejecting that outright, saying I don't see that. Also, I got Dr. King diagnosed him with a personality disorder with antisocial personality traits, which is can be very aggravating. So on one side, you have his mitigating evidence, and on the other side, you have Dr. King's aggravating evidence. So I really think that when you look at it all together, I don't think it's unreasonable for the court to weigh it out in the manner that it did regarding the prejudice prong. You know, Miss Graham, I just always like to put you on, I mean, take advantage of my time with you to let you know my concerns. So I actually do have some questions about the performance prong of the ineffective assistance claim. See, talk to me about the school records. By my account, you know, the records were requested in May, but the superintendent sent the records back under a cover letter dated June. And the trial was already well underway then. I mean, the YDR started right on May 18th or something like that. And then, you know, the testimony of Yarbrough who said he didn't know whether they had them in time for trial, and they were not put into evidence at trial. Sure. Is all of that right? I mean, yeah, that's great. I can't dispute any of that. I would like to say regarding the deficiency prong, when you look at this record, you do not have institutional records for Mr. Pye showing that he had intellectual disability or any other mental health issues. Regarding the defects records, unless I'm wrong, I'm sure Ms. Pitten will correct me, the only defects records I saw in this record were regarding Pye's sister's wanting to get back into school after she'd had a child at age 13. And that's all the defects records that I see in there. I do not see anything showing that they were extremely impoverished, that the kids were neglected, that the children did not have enough food or nourishment or anything of that nature. And indeed, the school records do not show that either. The school records also do not show that he was in a special education class. And if I recall correctly, the petitioner submitted an affidavit from a teacher saying he was in Title I classes, which is clearly shown in the school records. But that teacher also said that special ed was a different prong at school. It was different than the Title I. Title I was to help with certain issues that you have. You also didn't have him diagnosed as intellectually disabled throughout school. He went to prison at a relatively young age. They looked at him. They didn't see, other than he seemed pretty upset about being in prison mentally, they didn't find him to be intellectually disabled. And you looked at those prison records and he was... To follow up on the prison records, this is awkward, I guess, the Zoom call. But so, you know, there were no Department of Corrections records obtained. And, you know, I think Ms. Benton makes a pretty compelling argument about, you know, these two lawyers have been trying these death cases against each other, and they knew what the other one was going to argue. And so it does seem like a performance issue to me that, you know, Mr. Pye's lawyer didn't get the Department of Corrections records and didn't have the benefit of the testimony that we ultimately came to learn from the prison guards about how, you know, Mr. Pye was actually helpful in the prison setting. Yes, but that, again, is a piece of mitigating evidence that has contrary aggravating evidence, because you have his prison records, which show that he assaulted other prisoners, and he was aggressive with a guard. And he had many, and I know these are small things, it's a prison setting, but he had many infractions for failing to follow orders and things of that nature, that directly contradicts what those prison guards testified to in their affidavits. So while you may be able to get those prison guards to come and testify at while he was locked up there, that doesn't really coincide with what these people are saying. And that goes to the very heart, I think, of this case, and it's about credibility. Who do you believe? Do you believe Mr. Pye, or do you believe the state? Well, how do you weigh it if you don't even have the evidence? I mean, there was nothing in the way of the Department of Corrections. Am I understanding, how do you weigh it for the prejudice prong? I mean, you say that the records would have been as harmful as they were helpful, that's your argument? Correct. Okay, but the court never evaluated them. The state habeas court did evaluate the records. In the state habeas court's order, it lists all the DRs that he received. Okay, okay. That's on page six. It's document 20-40, the order, page 60 through 61, it looks like. So the state habeas court did go through that. And I'd also like to point out- Oh, I see that list, yeah. I've read that list. There's a lot of stuff here, I understand. Just on the performance thing, one more thing I wanted to ask you about, like it seemed pretty clear to me that there was no preparation of the mitigation witnesses before they got on the stand. And that's kind of backed up by this note from the multi-county public defender that talked about how Mr. Yarborough acknowledged that they had made a So from a performance evaluation as well, that seems like a problem. Well, first of all, I'd like to point out that that multi-county public defender's office memo is based upon hearsay. It's one person reporting what Mr. Yarborough said in a memo. And when you look at the whole of those multi-county public defender memos, they're very, very negative regarding Mr. Mostello and Mr. Yarborough. They clearly do not have a lot of respect for them. So I would call into question the reliability of that memo. But going back to whether or not they prepare the witnesses for trial, I understand they said that they did not in the affidavits. However, the state habeas court found pursuant to the billing records, which specifically state we spent this many hours preparing them for testimony at trial. Now, again, I don't have anything in the files here showing other than the billing records that they prepared them for trial. But you do have that. And that is a fact finding by the state habeas court. And there is support in the record for that. Ms. Graham, when did it first come out that Mr. Mostello had previously represented Alicia Yarborough and Charles Puckett? Was that on post-conviction relief? From what I understand, yes. Okay. All right. And so what is the record? If I go to the record, did he previously represent them? So yes, he represented Mr. Puckett a couple of years before he represented Mr. Pye. He represented Mr. Puckett regarding a burglary conviction. And he, if I remember, Mr. Puckett fled or he was tried, but that was in 1991. And obviously, it was many years later when he was representing Mr. Pye, but not many years, a couple of years later. And when you look at what they're saying he could have used, I don't see any sort of disloyalty there. I don't see any conflict because Mr. Puckett testified at trial that, you know, the door was kicked in at his home. Alicia was missing and, you know, his belongings were thrown out in the yard and that all of the physical evidence matched up with what Mr. Puckett said. So I'm not sure exactly why he needed to impeach him regarding the burglary or whatever. Now, regarding Ms. Yarbrough, I mean, the victim, he did represent, Mr. Moseler did represent her on a cocaine possession. And if you look at the testimony during, at trial during the medical examiner, because she tested positive for cocaine, he, Mr. Moseler attempted to get that information in at trial regarding her use of cocaine. And the trial court refused to let him in because you can't put the victim's character into evidence. So he did repeatedly try and get that information before the jury. So again, you wouldn't have any kind of conflict there. You don't have, I mean, he was clearly, you know, adamantly representing his client trying to get his version of the story before the jury. That's a great, let me try again on these Department of Corrections records. There's a lot of moving parts. So my question was about, you know, if Mr. Moseler knew that the argument was going to be made, oh, he's going to kill a prison guard, then why didn't he, I mean, as to his performance in the penalty phase, isn't that a problem that he didn't even try to get the Department of Corrections records that could have rebutted that? Well, first of all, again, you know, we're getting trial counsel's record here. There's no index to the record. There's no testimony from Mr. Moseler, Mr. Yarbrough saying, you know, X, Y, and Z was in this file. We did this. We don't know. So in some respects, You're not saying you think they were in the file, are you? I don't know. I mean, the record is essentially silent on that. Unless I have missed it in those Department of Corrections files where it shows that Mr. Moseler didn't get them. But even assuming, even assuming here that Mr. Moseler failed to get those Department of Corrections records, I still don't see how that, if he had used those Department of Corrections records, how they would have assisted him in rebutting the future dangerousness when you have him attacking other prisoners and being aggressive with a guard. At least as a prosecutor. Sorry. Supreme Court and I think it was Skipper versus South Carolina say that if the prosecutor introduces evidence of future dangerousness, due process requires that the defendant have an opportunity to introduce evidence on this point. Yes, but that would be a due process claim and there is no due process claim raised here. This is under ineffective assistance of I would say that that's distinguishable there. But he was not given an opportunity to introduce evidence on future, lack of future dangerousness, was he? Well, he was not precluded from it. The fact that his counsel did not do it doesn't mean that he was. Counsel wasn't prepared to do it. No comment. But assuming his counsel was unprepared to do it, Skipper is about not allowing them to be able to put up this information. And here no one, the state did not keep him. The trial court did not keep Mr. Pye from putting up this information. He wasn't precluded from it. It simply was not presented. How was that? How was the information imparted to the jury? Was it through testimony or through the closing argument of the prosecutor? It was the closing argument of the prosecutor. Well, then he would not have an opportunity to rebut that if that's an argument that was he's going to, if he doesn't, if you don't get the death penalty, he's going to kill the prison guard. So he had no opportunity to rebut that, did he? Assuming that trial counsel's closing was before the state's closing argument, then I would, I would say no. But again, there is, there was no law precluding it. Perhaps the circumstances hindered it, but there was no law or trial court ruling precluding them from presenting that. Going back to the deficiency prong, Judge Martin, did I answer your questions? I just wanted to make sure. I just, you know, I don't, I'm not sure you did. I mean, I think there are a lot of problems with the, with the performance. And to me, the, you know, the, the prejudice questions, decision by the state habeas court is problematic as well, but you don't make the facts. So you, you don't have to worry about that. You know, the chips kind of fall where they fall, right? Right. And again, going back to the prejudice analysis here, you know, when you look at what the state habeas court did, it went through the that petitioner presented. But as this court is aware, the state habeas court does not have to list all of the evidence that was presented before it. The court just has to make a reasonable determination based upon the facts under Strickland that there was no reasonable probability of a different outcome. And when you look at this case in total, you have a very aggravated crime. And although you have evidence here of poverty and possible physical abuse, again, he was older and the jury is going to think of that. They're going to say, well, you know, I mean, he was 28 years old and he just testified to us that he's a known drug dealer in his community. So all of this information, you put it all together and I don't see how you can say no reasonable jurors would find that the aggravating evidence out did not outweigh the mitigating evidence in this particular case. Looking to see if I had any other notes. I'm sure I will think of many other things to say after the argument. But at this time, I would ask that this court affirm the denial of relief by the district court. Unless you have any more questions, I will be quiet. Thank you, Miss Graham. Thank you. Thank you, Miss Graham and Miss Benton, you reserve some time for rebuttal. Thank you, Judge Wilson. I am unmuted, correct? You are. We can hear you. I want to take a moment to kind of tease out first with respect to deficiency and the records and then make a couple of brief points with regard to prejudice in the ISE context. I think there was a little bit of confusion sewn around what these various records do, the school records, the defects records and the corrections records. And it is not our that those records alone would have gotten to prejudice or even the trial counsel necessarily had a duty to introduce those records. What those records do is put counsel on notice of the need to investigate and the need to get a mental health evaluation. The school records don't show conclusively that he's intellectually disabled. They show that he is a child who cannot make it through junior high. He repeats the seventh grade twice. He then drops out after eighth grade. He is promoted from grade to grade after a series of failing grades. They show you have to figure out what's happening there. Tell me if you're if I'm thinking about this the way you're thinking about me. To me, it just shows a lack of preparation. So it goes to counsel's performance. I mean, you know, you've asked for the school records, you know, after the trials already started and you never get the Department of Corrections records, even though you know what arguments coming and closing arguments. So that's that's the way I'm looking at it. Is that I mean, exactly. If he had gotten the school records and they had shown an IQ in the intellectually disabled range in the middle of trial, what's trial counsel going to do that? He's already conducted what he or he can't even what year the jurors about their experiences with intellectually disabled persons. The trial is already underway. The school records are one factor among several that show that trial counsel should have performed investigation or taken another step. The trial counsel clearly did not under Rumpia. He had a duty to go and investigate what he knew would be the state's evidence in aggravation, whatever that is. And it doesn't mean that the aggravating evidence necessarily would have had something to do with what he discovers there. You know, in Rumpia, what they discover isn't evidence that has to do with that prior conviction that they know that the state's going to introduce what they discover in the aggravating records in the evidence around the prior convictions, mental health evidence. And that's the case here. The DOC records, you know, whether they should have been introduced or not, whether what they do with respect to the prejudice prong on the testimony of the prison guards who say that he was a cooperative, nonviolent, congenial inmate, setting aside that issue. Trial counsel looking at these DOC records can't not have him evaluated. They say things like he displays a flat affect and rather fragile composure, that he's emotionally withdrawn, that he hears voices calling his name, that he's depressed, that there are elements of psychotic withdrawal shown, and therefore he needs chemotherapy treatment that combines both antidepressant and antipsychotic action in a single drug. Ms. Fenton, is there any evidence in the record at all about why no mental health examination was sought or performed? No, Judge Pryor, there is not. Mr. Yarbrough offers up some speculative reason once he's confronted with the fact that there wasn't one done. He's surprised by that and says it was Mr. Mosler's typical course to get one in a capital case, but there's no evidence about why one wasn't done. But we do know that he didn't have these DOC records, and if he'd had the DOC records, you have to move forward with an evaluation. Ms. Fenton, how do you respond to the state's argument that, yes, there was a lot of mitigating evidence that could have been presented that might have made a difference to the jury, but it's up to the state to match that up against all the aggravating evidence, and we're required to defer to their determination? Well, in evaluating that aggravating evidence, you have to take into consideration what was produced in the habeas court, and that evidence shows that the aggravation isn't as substantial as the sentencing jury was led to believe. You know, we have the testimony from Linda Lyons, who is the victim's dear friend, her neighbor, who says both to the police at the time of the initial investigation, and in an affidavit given to the habeas court, no, she left of her own accord. I watched her walk away on her own steam. I heard her use my phone to call someone and ask to be picked up. She called a motel room. You know, you have to take into that account, consider that evidence, the evidence of the victim's drug use, which trial counsel did not have admitted. He tried once. Having failed, the trial judge says, if you can link it up, if you can show there's some reason that it's relevant, you can try again. And then Mr. Pye testifies to an exchange of drugs for sex. He testifies that the victim was there voluntarily, and Mr. Mosler makes no further attempt after that to reintroduce the evidence of her drug use, which wasn't available from just one source. It wasn't available from just the autopsy report that she had. How about the brutality of the crime? Well, the brutality of the crime, that aggravating evidence centers around the notion that the victim is there involuntarily, that there's force used to get her there. You know, the most aggravating facts of this case are that there is a kidnapping and a gang rape. But trial counsel didn't do the investigation needed to call all of that into question. And there's other evidence out there that calls into question Mr. Freeman's credibility and the reliability of his testimony. He's the only witness who says that the victim was there against her will. So, you know, the two key aggravating pieces have to do with how she got there and whether she, you know, whether her actions are voluntary or whether she's a victim. And, you know, that's subtracted from the equation and suddenly a very different case. And if you combine that with the evidence of his prison nonviolence, you know, you have prison guards who are willing to speak up and say this was a helpful congenial inmate. The records show, you know, write-ups later in his period of incarceration for things like not bringing his cup back to the mess hall and not tucking in his shirt when he's asked, you know, there's a lot of insubordination, write-ups, but there is not in any way the kind of violence that the district attorney is describing. The district attorney's saying he'll kill a prison guard to get out. You know, and as to the causal link, again, with respect to prejudice, there most certainly is here that the mitigation evidence puts the evidence of Mr. Pye's relationship with the victim in an entirely new light. You know, the jury is being told that they have a loving relationship and yet there are these prior instances of fights between them. They're, you know, they're learning about his drug dealing. All of that takes on a whole new light if you know the mitigation story. I see that I've gone beyond my time. All right. Thank you, Ms. Fenton and Ms. Graham. And that completes our arguments for this afternoon. This court is in recess.